IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 6, 2018

## IN RE CHARLES R.

**Appeal from the Juvenile Court for Fentress County**
**No. 2015-JV-126      Michael Todd Burnett, Judge**

_____

### No. M2017-02387-COA-R3-PT

_____

Parents appeal the termination of their parental rights. On April 24, 2013, the then three-year-old child was removed from the parents' home after a visitor to the home notified the Department of Children Services that he saw the child behind what appeared to be a jail-cell, making only grunting noises. The child has been in foster care ever since. After working with the parents for nearly two years, the Department filed a petition to terminate the parents' parental rights. Following the first trial in October of 2015, both parents' rights were terminated; however, that decision was vacated and the case remanded "for a new hearing so that a complete transcript may be produced. . . ." Order, *In re Charles R.*, No. M2015-02347-COA-R3-PT (Tenn. Ct. App. Nov. 22, 2016). Following a second trial in September and October of 2017, the trial court entered an order on November 21, 2017, terminating both parents' rights. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which CHARLES D. SUSANO JR. and BRANDON O. GIBSON, JJ., joined.

Cynthia Fields Davis, Crossville, Tennessee, for the appellant, Charles R.[1]

Matthew S. Bailey, Spencer, Tennessee, for the appellant, Cynthia R.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Leslie Clark Ledbetter, Clarkrange, Tennessee, Guardian Ad Litem.

_____

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

**OPINION**

Charles R. ("Father") and Cynthia R. ("Mother") (collectively "Parents") are the parents of Charles, born in January of 2010.

On April 24, 2013, Nathaniel Linder, a service technician, went to the family's home to address a problem with their internet connection. When Mr. Linder entered the home, he noticed a small child, Charles, locked in a room behind two gates, one stacked on top of the other. He observed as the child shook the gates while making only non-verbal grunting noises. As Mr. Linder explained at trial, the child "couldn't – he was, you know, 'uhh, uhh.' He couldn't talk. About all he could say was, 'uhh,' and he was – I remember he was at the top of that door shaking whatever they had over that." Mr. Linder also observed two dogs running loose that "had . . . us[ed] the bathroom everywhere." As a consequence of what he observed, Mr. Linder promptly returned to his vehicle and contacted the Department of Children's Services ("DCS").

That evening, local law enforcement obtained a search warrant for the home, and DCS obtained an *ex parte* order allowing it to investigate the home and examine the child. Based on its investigation and examination, DCS immediately removed Charles from Parents' care and placed him into foster care.

Detective Nicholas Hamby, who executed the search warrant and was in charge of taking photos and documenting the conditions of the home, testified at trial that

> [the home] was in disarray and a few things [were] out of place. There was feces and urine from animals all through the house. . . . At the very end of the hallway, there was two, what appeared to be baby gates, or dog gates that were stacked one on top of the other kind of like a cage or jail cell, an old-fashioned jail cell, something like that. That was what was reported to us where a young child had been at, was the reason we were there.

> • • •

> I opened the gates. We had to – I had to pull the latch up and open it and go under the top gate. When I went in, on the floor you could – from my boots I could feel the squishiness of where urine – it reeked of urine.

> • • •

> When I exited . . . after taking pictures, my knee actually hit the ground and it was soaked from whatever liquid was on the ground that smelled of urine.

In the room with the gates, Detective Hamby took pictures of the windows, which were filled with insulation. On the insulation there were splotches which Detective Hamby testified "from the smell and from the looks . . . appeared to be fecal matter." During Detective Hamby's time in the home the child was sitting on the couch in the living room playing with a salt shaker. The child never spoke "any words, never [was] able to verbalize anything, a lot of mumbling."

Michael Weaver and Tonya Scott with Child Protective Services also came to the home that afternoon to investigate. Like Detective Hamby, Ms. Scott observed that the home smelled like urine. Ms. Scott was also able to observe sleep medication in areas of the home in which the child could reach. After Ms. Scott and Mr. Weaver spoke to Parents, they revealed that although the child did not sleep in the gated room, he is sometimes put into the room and that the double gates were to prevent the child from climbing over one gate. After investigating the home and determining Parents' explanation of the issues with the home did not alleviate DCS's concerns, the child was removed from the home that evening and placed into foster care. According to Ms. Scott, the child did not appear upset or traumatized by the removal.

Two days later, on April 26, 2013, DCS filed a petition to declare the child dependent and neglected in the juvenile court of Fentress County. On October 21, 2013, the juvenile court adjudicated the child dependent and neglected and found that the child was a victim of severe abuse. Parents appealed. During the eventual termination proceeding, the dependency and neglect appeal was still pending.[2]

DCS developed several permanency plans in this case. In total, the plan was modified five times. The first was developed on May 14, 2013, with dual goals of returning the child to Parents and adoption. The original plan required, *inter alia*, Parents to submit to a parenting assessment; communicate openly and honestly during the assessment; comply with any follow up made as a result of their parenting assessment; demonstrate strong parenting skills during their contact with the child; maintain a residence that has sufficient room for the child and is free from any significant safety hazards; and maintain a budget. The modified permanency plans added additional action steps, such as: informing DCS of any prescribed medications; allowing DCS to perform a random pill count on prescribed medications; demonstrating an ability to keep the home free from animal urine and feces; and allowing DCS to make announced and unannounced visits to the home.

---

[2] As we will discuss in more detail, the trial court erred in relying upon any of the findings the court made in the dependency and neglect proceedings since the case was still on appeal. *See In re Shyronne D.H.*, W2011-00328-COA-R3-PT, 2011 WL 2651097, at *5 (Tenn. Ct. App. July 7, 2011).

To aid Parents in complying with the permanency plan, DCS provided Parents with support, which included the following: attempted to assist Father in trying to find a job; provided supervised visits at locations Parents chose; sought parenting and psychological assessments for Parents; ensured that Parents had access to these assessments and provided the funding for these assessments; conducted home visits; and consulted with Parents about the child's progress and the permanency plan.

Parents, however, rarely cooperated with DCS. Furthermore, Parents failed to complete numerous objectives under the permanency plan. Heather Wright, the DCS family service worker for foster care, testified concerning Parents' failure to complete objectives of the permanency plan. Ms. Wright was assigned to the case from December 19, 2013, until the case was assigned to another DCS employee, who worked under Ms. Wright's supervision, in March of 2017. Ms. Wright testified that she attempted to conduct 12 home visits and was able to get inside the home maybe "three or four times." Furthermore, she testified that although the home looked "a little bit better" on her last home visit, she also stated that Parents' home "looked very similar to the pictures" Detective Hamby took when the child was removed. However, Parents did "get the room that they initially stated was [the child's] room – not the one with the gates, . . . a little bit tidy for [the child]."

Ms. Wright also testified about numerous other objectives Parents failed to meet. Although Parents did complete psychological evaluations which contained a parenting component, neither parent complied with the psychological assessment or the recommendations from the assessment. Parents never informed DCS about prescription medications or allowed them to conduct a pill count. Parents never provided Ms. Wright with vaccination records of the animals. Parents did have a residence that was an adequate size for the child, but the house was not safe.

One of the larger concerns was Parents' inability to keep their home clean and safe. Ms. Wright testified that Parents did not demonstrate appropriate housekeeping skills. Furthermore, Ms. Wright testified,

> With the odor as strong as it was and with there being fecal matter and animal urine in the home, those things are harmful to adults. It's especially harmful to small children, who are still putting things in their mouths, not wanting to wear shoes, and they don't really mind as much to be dirty or – I felt like that opened up – a child that was there would open them up to bacterial infections or infections of other kinds.

Charles Cobble was the social worker and family development therapist for Health Connect America who supervised Parents' visitation. Mr. Cobble visited Parents' home numerous times while the child was in state custody. At trial, Mr. Cobble testified that during one visit the temperature in the main area of the home was 47 degrees. Although

the bedrooms apparently had space heaters, this temperature concerned Mr. Cobble. Mr. Cobble further testified,

> the home appeared to quickly deteriorate from the time when we started the visits 'til we removed the visits from the home.[3] There was a urine odor in the home. I had observed that the floor had become sticky, the tiles when you would walk across them.

> •••

> [T]here was a more specific [incident] that I'd like to reference that was of some greater concern . . . . [Parents] had gotten [their] puppies out for Charles to play with and the one had defecated, and [Charles] had got his hands in it. And [Mother] proceeded to take a dishcloth and wipe his hands off and put some hand sanitizer on them, and that was of some concern to me.

> •••

> There was another incident . . . where . . . [t]here was a pile of dog feces by the bedroom's door, and the father had walked past that and did not clean that up. . . . I mean, he walked past it a couple of times . . . .

Another incident involving the condition of Parents' home occurred in 2017 when Father was indicted, and later arrested, for three violations of the sex-offender registry. Chief Detective James Markwood, Deputy Jerry Mifflin, and Sergeant Max Goodpasture of the Fentress County Sheriff's Department, served Father with the indictment. As the three officers approached Parents' home they noticed a "very strong" odor coming from the home. They also noticed "a lot of animal feces" on the porch. When Father answered the door, the officers noted an unpleasant odor on Father. From outside, the officers saw dogs, a pig, and more animal feces inside the home. After Father was arrested and transported to the justice center, the officers had to open the windows in the booking area and clean the back of the patrol vehicle where Father was sitting.

---

[3] Parents' supervised visits initially occurred in their own home. However, it was later determined that the visits should occur in a public location. Mr. Cobble testified that Parents' home was surrounded by constant distractions; primarily, from several dogs in the home. According to Mr. Cobble, Parents tended to focus their attention on the dogs and how the child interacted with the dogs. Due to these distractions, Mr. Cobble felt it best to remove the visits to a neutral environment.

DCS also had issues with the individuals in Parents' home. Mother's father apparently registered his sex offender status using Parents' address,[4] and he had reported that he was living with Parents. Mother denied knowledge that her father had registered using her address but did acknowledge that he stayed with Parents for a few weeks during the period of time he was required to register as a sex offender.

Parents also had three other individuals living with them in 2015; a couple, Bill and Arlene,[5] and Christopher S., Mother's brother. Bill and Arlene only lived in the home a short time and overlapped their stay with Christopher by two weeks. Christopher still lived in the home at the time of trial. Bill and Arlene had two dogs with them, both of which contracted parvo and spread it to Parents' dogs. Christopher testified at trial that Arlene abused Bill, and on one occasion, Parents' neighbors called the police on the two.

Although a significant amount of testimony focused on Parents and their attempts to comply with the permanency plan, the vast majority of remaining testimony focused on the child. Sara Ramsey, a clinically certified speech-language pathologist,[6] performed a preschool language scale assessment on the child roughly a month after his removal from Parents' home. Ms. Ramsey testified that a one to two-year-old child should have a vocabulary of 50 to 100 words. Charles, however, spoke only a few words.[7] Furthermore, she testified that a three-year-old child should be able to participate in conversations with peers and adults, participate in play, follow directions, and ask and answer questions, but Charles could not. Due to the child's inability to speak and interact, Ms. Ramsey could not complete the speech assessment. She also could not complete the hearing screening because the child could not follow directions. As she explained at trial,

> Ms. Ramsey: For a hearing screening, they have to be able to raise their hand or let you know that they hear the sounds, and he couldn't verbalize to me that he heard the sounds and he couldn't raise his hand.
>
> Attorney: So what would happen when you would give Charlie instruction? What was his demeanor?

---

[4] Helen Cook testified that it was her job, among other things, to register sex offenders in Fentress County, and that Father and Mother's father went to Ms. Cook to register Mother's father using Parents' address.

[5] Mother testified that she did not know Bill and Arlene's last names.

[6] Ms. Ramsey was certified at trial as an expert in speech and language pathology.

[7] Ms. Ramsey's report noted that Charles spoke only five words, and she testified at trial that he spoke four words the day of the assessment.

Ms. Ramsey: Mostly he just kind of did what he wanted to do. If I asked him to do something, I don't want to say he was ignoring it, but he wouldn't do what I asked him to do.

Attorney: So I assume you said, "Listen for a sound and raise your hand?"

Ms. Ramsey: Yes.

Attorney: So what happened?

Ms. Ramsey: Nothing.

Attorney: He just sat there?

Ms. Ramsey: Uh-huh.

The child also met with Carol Crabtree, an Early Intervention Specialist, who worked with the child at the Early Learning Center beginning in May 2013[8]. The language pathologist at the Early Learning Center tested the child in five domains: physical, communication, cognitive, thinking skills, and social-emotional. Although Ms. Crabtree worked primarily on his communication and social-emotional domains, the only domain in which the child was appropriately developed was physical. Ms. Crabtree testified that "[o]verall, I would have said he came to me as about an 11-month-old, other than this physical development." The child also had severe issues interacting with other children. Ms. Crabtree explained,

Socially, he could be very charming and outgoing. But if things weren't going his way, he literally became like an animal. . . . When other children would try to play with him or engage in some way with him, he would crouch down on all fours, bare his teeth, and growl. He bit a lot.

Ms. Crabtree testified that the child was neglected, and that she didn't believe the child was communicated with. Furthermore, she stated:

I don't think that – in a typical relationship with a child, they focus on your eyes. They focus on your face. And when you express yourself, they will respond with imitation. He didn't – he would imitate other things, but he didn't have the facial expressions. . . . It would appear no one had talked to him.

---

[8] Ms. Crabtree was certified as an expert in child development and early intervention at trial.

Dr. Bradley Freeman conducted a forensic mental health evaluation of Charles on June 11 and August 20, 2014. Dr. Freeman concluded that the child's developmental delay was "more likely than not . . . due to early environmental neglect rather than an organic etiology (e.g. autism, dyslexia, learning disorder.)" Dr. Freeman's conclusion was based upon, *inter alia*, the improvement the child had made since coming into DCS's custody.

As stated above, after Charles was taken into DCS's custody he began attending the Early Learning Center to improve his severe language impairment. Charles' six week progress report indicated his vast improvement in a short period of time.[9] The report read in pertinent part,

> Charles is making steady progress. With the seriousness of his delays, much time is needed to address all concerns; which include his aversion to closed doors and child safety gates. This aversion interrupts every aspect of his development because he screams when any door is closed near him. His improvement, however, is quite exemplary. He has gone from primarily screaming and gesturing to actually using words to communicate. He initially used predominantly a range of five consonant sounds and his consonant usage now includes all except /r/ and /f/. When shown a train – he will say choo choo; a car – he will say beep beep; and an ambulance or police car he will say wee-oo wee-oo. His use of vocabulary has grown from under ten words to twenty five spontaneous word approximations. He has recently been documented combining two words into a phrase and last week he even produced a three word phrase. He continues to need prompting and support to encourage his use of vocabulary; but he imitates well, maintains joint attention and eye contact-three very basic components of language acquisition.

Further evidence introduced at trial which tended to show Charles's improvement while in DCS custody came from Jennifer Choate, the child's preschool teacher for the 2014 – 2015 school year. Ms. Choate revealed that although Charles scored below average in all subjects except reading at the beginning of the year, the child "went from being at the bottom at the beginning of fall to being toward the top in winter."

Ms. Wright also testified to the child's improvement. In her six years of working exclusively in foster care with DCS, Ms. Wright estimated that she had worked with over one hundred children, and stated she saw "the most improvement in Charlie than any other child."

---

[9] The progress report was dated July 19, 2013. This would be roughly one month after Sara Ramsey performed the preschool language scale assessment in which the child only spoke a few words.

Eventually, DCS determined that reunification was no longer a goal and petitioned the court to terminate Parents' parental rights. The Juvenile Court of Fentress County conducted a trial on the petition on September 25-26 and October 20, 2017, in which the above facts were entered into evidence.[10] At the conclusion of the trial, the juvenile court entered an order on November 21, 2017, terminating both Parents' parental rights on the grounds of abandonment by failure to establish a suitable home, substantial noncompliance with the permanency plans, persistence of conditions, and severe child abuse.

Father filed a notice of appeal on December 4, 2017, and Mother filed a notice of appeal the following day.

## ISSUES

I. Whether the trial court erred in denying Parents' motion requesting Judge Burnett to recuse himself?

II. Whether the trial court erred in relying upon the finding of dependency and neglect while the case was on appeal?

III. Whether the trial court erred in finding that grounds existed to terminate Parents' parental rights?

IV. Whether the trial court erred in determining that termination of Parents' parental rights was in the child's best interest?

## ANALYSIS

### I. MOTION TO RECUSE

On March 10, 2017, Father filed a motion to recuse in which Mother joined. The trial court denied that motion on June 28, 2017. On appeal, Parents argue that the trial court erred in denying this motion because Judge Burnett "risked" *ex parte* communication with the foster mother because the two were Facebook "friends." This argument stems from the foster mother posting pictures of Charles while they were at Disney World. Therefore, Parents argue, the trial judge "risked seeing the photographs,

---

[10] As noted earlier, this was the second trial. The first trial was held in October of 2015, which resulted in the termination of Parents' parental rights. When Mother and Father appealed, this court vacated the judgment and remanded "for a new hearing so that a complete transcript may be produced should either parent choose to file a new appeal." Order, *In re Charles R.*, No. M2015-02347-COA-R3-PT (Tenn. Ct. App. Nov. 22, 2016).

because even without clicking on a friend's profile, the Facebook news feed shows their posts."

Appellate courts review a trial court's decision on a recusal motion de novo, with no presumption of correctness accorded to the trial court. Tenn. Sup. Ct. R. 10B, § 2.01.

"[O]ne of the core tenets of our jurisprudence is that litigants have a right to have their cases heard by fair and impartial judges." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001). Accordingly, at all times judges must conduct themselves "in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary…." Tenn. R. Sup. Ct. 10, RJC 1.2. Judges are required to recuse themselves from any proceeding "in which [their] impartiality might reasonably be questioned…." Tenn. R. Sup. Ct. 10; RJC 2.11(A). This is so even when no party has filed a motion for recusal. Tenn. R. Sup. Ct. 10, RJC 2.11, cmt. 2.

A motion to recuse should be granted when judges have any doubt about their ability to preside impartially in a case or when "a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Davis*, 38 S.W.3d at 564 (Tenn. 2001) (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)); Tenn. Sup. Ct. R. 10, RJC 2.11(A).

Here, the trial judge denied that he had seen the foster mother's Facebook post; furthermore, the trial judge stated that Fentress County is a small community in which he is very active and has lived his entire life. The judge also stated that he had between 3,500 and 4,000 Facebook "friends," and that "according to Facebook" the only interaction he has had with the foster mother was the two wishing each other a happy birthday. The judge further explained that in trying to maintain a presence in the community, he tries to tell every person on Facebook "happy birthday," when Facebook notifies him that it is a person's birthday. Lastly, the trial judge had not seen the photo in question until he reviewed the motion to recuse.

These facts, without more, do not demonstrate any bias, impropriety, or reliance upon extrajudicial facts by the trial judge. *See State v. Madden*, No. M2012-02473-CCA-R3-CD, 2014 WL 931031, at *7 (Tenn. Crim. App. Mar. 11, 2014) ("Simply establishing that a trial judge is acquainted with a . . . person connected to a case" is not enough; rather, "[t]here must be some sort of a connection shown between the judge's relationship with a lawyer, party, or witness and some action taken in the case."); *see also State v. Forguson*, No. M2013-00257-CCA-R3-CD, 2014 WL 631246, at *13 (Tenn. Crim. App. Feb. 18, 2014) (holding that the defendant had not established that the judge's Facebook friendship with one of the state's witnesses "prevented [the trial judge] from properly exercising his role. . . .").

Therefore, we affirm the trial judge's denial of the motion to recuse.

## II. RELIANCE ON FINDING OF DEPENDENCY AND NEGLECT

On April 26, 2013, DCS filed a petition to declare Charles dependent and neglected in the juvenile court of Fentress County. On October 21, 2013, the juvenile court adjudicated the child dependent and neglected and found that the child was a victim of severe abuse. Parents appealed that decision to the circuit court. Although the appeal was still pending when the petition to terminate was being tried in 2017, the trial court relied upon some findings of fact and credibility determinations from the dependency and neglect proceedings in its order terminating Parents' parental rights.

In this appeal, Parents argue that this was error because the dependency and neglect order was still pending on appeal during the pendency of the parental termination trial. DCS agrees that this was error but argues that it was harmless error. The Guardian ad Litem also agrees that the trial court erred but argues the error is not reversible because the trial court also made its own findings of fact exclusive of the dependency and neglect order.

For *res judicata* and collateral estoppel to apply, a final judgment is needed to create a preclusive effect. *In re Shyronne D.H.*, No. W2011-00328-COA-R3-PT, 2011 WL 2651097, at *5 (Tenn. Ct. App. July 7, 2011). "[A] prior order, which is not res judicata, cannot form the basis, standing alone, for termination of parental rights on any ground that contemplates reliance on a previous finding or order." *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *8 (Tenn. Ct. App. Nov. 16, 2015). Accordingly, the trial court's findings and conclusions in the dependency and neglect order do not carry a preclusive effect because the judgment was not final; rather it was pending on appeal. Therefore, the trial court erred in relying upon a non-final order. The issue then becomes whether this error is reversible. We have determined it is not.

The trial court made independent findings of fact that were based upon the testimony of the witnesses and exhibits admitted during the trial in September and October of 2017. For example, in the trial court's order terminating Parents' parental rights, the court stated, "It's clear from the proof <u>in this trial</u> that the parents did nothing to protect this child from this neglect and are, in fact, the perpetrators of this neglect which was severe abuse." (Emphasis in original).

Therefore, although the trial court's reliance on findings in the dependency and neglect proceedings was error, the error was harmless because the trial court made numerous relevant and material findings of fact based upon evidence presented during the trial of this case in 2017. Accordingly, as we review the trial court's findings of fact and conclusions of law as they relate to the grounds to terminate and whether it was in the

child's best interests to terminate Parents' parental rights, we will only review the trial court's findings which were based upon the 2017 trial of this case.

## III. GROUNDS FOR TERMINATION

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c)). We review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *Id.* (quoting Tenn. R. App. P. 13(d)).

However, because of the heightened burden of proof in termination proceedings, this court must make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016) (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)). The trial court's ruling regarding whether the evidence sufficiently supported termination is a conclusion of law, which we review de novo with no presumption of correctness. *See id*.

Here, the trial court found that four grounds existed to terminate Parents' parental rights: (1) abandonment for failure to establish a suitable home; (2) persistence of conditions; (3) substantial noncompliance with the permanency plan; and (4) severe abuse. DCS concedes two of these grounds on appeal: abandonment for failure to establish a suitable home and persistence of conditions.

Though we are aware of the Supreme Court's opinion in *In re Carrington*, which requires this court to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal, this case is distinguishable from *Carrington*, in that DCS is the party conceding, not Parents. Therefore, we hold that the trial court's finding of abandonment for failure to establish a suitable home and persistence of conditions may not serve as a basis for termination of Parents' parental rights. Accordingly, we will determine whether either or both of the remaining two grounds may serve as a basis for termination.

### A. Substantial Noncompliance with the Permanency Plan

The trial court found that both parents failed to substantially comply with their permanency plans. Specifically, the trial court found that neither parent regularly demonstrated appropriate parenting skills, followed recommendations from psychological

12

evaluations, allowed DCS to make announced and unannounced visits, provided DCS with proof of rent or mortgage or lack thereof, proof of utilities payments, demonstrated appropriate housekeeping skills or their ability to keep their home free of animal waste, provided DCS with verification of worming and/or vaccinations for their animals, or cooperated with DCS case managers and service providers.

On appeal, Father argues that "Father actually completed several of the requirements of the permanency plans. The record is clear he made every scheduled visitation with very few exceptions." Mother argues that she was substantially compliant with the permanency plans because evidence at trial established the child's connection with Mother, Mother completed a psychological assessment, Mother testified to completing a parenting class, the home was large enough for the child, and although Parents did not provide DCS with receipts, the home had running water and electricity.

A parent's parental rights may be terminated when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2) (2017). Terminating parental rights based on substantial noncompliance "requires more proof than that a person has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). DCS must first show that "the requirements of the permanency plan are reasonable and are related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *Id*. (citations omitted). DCS must then demonstrate that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id*. (citations omitted).

Here, the trial court found that the plans' requirements were reasonable and related to remedy the conditions that necessitated foster care placement. The permanency plans' requirements focused on, *inter alia*, Parents providing a clean and safe environment for the child and improving Parents' actual parenting skills. This is demonstrated by the requirements to demonstrate appropriate parenting skills, follow recommendations from psychological evaluation, demonstrate appropriate housekeeping skills, and keep the home free from animal waste. However, as we discuss in detail below, the trial court correctly found Parents substantially failed to comply with these requirements.

*1. Demonstrate appropriate parenting skills and parental education*

The trial court found that neither parent demonstrated appropriate parenting skills. Mr. Cobble, the social worker and family development therapist for Health Connect America who supervised Parents' visitation; Ms. Wright, the DCS family service worker for foster care, and Rebecca Lee, the family service worker who preceded Ms. Wright, all testified that Parents did not demonstrate appropriate parenting skills during visits with the child. Ms. Wright and Mr. Cobble further testified that they did not see any

improvement in Parents' parenting skills. Parents did complete a psychological evaluation which contained a parenting component. This evaluation came with certain recommendations for Parents, such as receiving additional training to develop certain parenting skills that Parents were lacking. However, Parents did not follow these recommendations.

We acknowledge that Mother testified that she completed a parenting class; however, the trial court found that Mother's testimony was not credible and that Ms. Lee, Mr. Cobble, and Ms. Wright were credible. These findings are significant because appellate courts give great weight to a trial court's factual findings that rest on determinations of credibility and weight of oral testimony. *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 599 (Tenn. Ct. App. 2006) (citing *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)). When it comes to live, in-court witnesses, appellate courts afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Id.* (quoting *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)) (alteration in original).

Therefore, the record clearly and convincingly supports the trial court's finding that Parents did not demonstrate appropriate parenting skills or complete parental education.

### 2. Announced and unannounced visits

There is substantial evidence in the record that Parents failed to comply with this requirement. Ms. Wright attempted twelve home visits but was able to conduct only "three or four." Furthermore, Ms. Wright specifically referenced an attempt, when the child was with her, in which she saw Mother go inside as she pulled her vehicle into Parents' driveway. Ms. Wright then went to the door with the child and knocked. However, no one answered, and there was no visitation that day. Therefore, the record clearly and convincingly supports this finding as well.

### 3. Proof of rent/mortgage payments, maintain a budget, and provide receipts for utilities.

The evidence at trial established that Parents only completed one budget and did not provide DCS with proof of rent, mortgage, or payment of utilities. Mother even concedes this point in her brief. She simply argues, that "[w]hile there is not evidence that [Parents] completed and maintained a budget and provided DCS with receipts, the

14

home had running water and electricity." Nevertheless, the requirement was to provide proof of payments, and this was clearly not done.

*4. Demonstrate appropriate housekeeping Skills, Keep the home free of animal waste, and provide DCS with verification of worming and/or vaccinations for their animals.*

A large portion of testimony was devoted to Parents' inability to keep their home free and clean from animal waste. The scene of the home when Father was arrested in 2017, which was four years *after* the child's removal, clearly and convincingly, proves Parents' inability to keep their home clean and safe for the child. Briefly, testimony established that when Father was arrested, the home had a "very strong" odor; there was "a lot of animal feces" on the porch; when Father answered the door, officers noted an unpleasant odor on him; from outside, officers saw dogs, a pig, and more animal feces inside the home; and lastly, after Father was arrested and transported to the justice center, officers had to open the windows in the booking area and clean the back of the patrol vehicle where Father was sitting. There was also evidence, or lack thereof, that Parents provided DCS with any information related to the deworming/vaccinations of their animals, which is material because Mother testified that thirteen dogs, including eight puppies, lived inside the home when the child was removed. Therefore, the record clearly and convincingly supports this finding.

*5. Cooperation with DCS case managers and service providers*

Evidence at trial showed that four different DCS workers were assigned to this case. Due to Ms. Wright's experience working for DCS, she was the third case worker assigned to the case due to the difficultly Parents caused the two previous workers. As established above, Parents failed to substantially comply with allowing DCS to conduct announced and unannounced visits. Mother failed to inform DCS of any prescribed medications or to allow DCS to conduct a pill count. Furthermore, Mother did not allow a service worker to complete a bonding assessment. Mother would not even speak to the service worker trying to complete the bonding assessment.

Ms. Wright proved instances in which Mother became irate and acted very inappropriately in front of the child. Ms. Lee, the family service worker who preceded Ms. Wright, also testified that Mother became aggressive and yelled in front of the child. Although most difficulty in cooperation stemmed from Mother, there was also testimony that DCS had difficulty working with Father. Ms. Wright testified to instances in which Father would become confrontational on the phone but said he would usually call back and apologize.

As we noted at the beginning of our analysis of this ground, the trial court found that both parents failed to substantially comply with the permanency plans. Specifically,

the trial court found that neither parent regularly demonstrated appropriate parenting skills, followed recommendations from psychological evaluations, allowed DCS to make announced and unannounced visits, provided DCS with proof of rent or mortgage or lack thereof or gave proof of utilities payments, demonstrated appropriate housekeeping skills or their ability to keep their home free of animal waste, provided DCS with verification of worming and/or vaccinations for their animals, or cooperated with DCS case managers and service providers. For the reasons stated above, there is clear and convincing evidence to support the trial court's finding that Parents did not substantially comply with the permanency plans. Accordingly, we affirm the finding that DCS proved the ground of substantial noncompliance with the permanency plans.

## B. Severe Child Abuse

A parent's rights may be terminated when,

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian. . . .

Tenn. Code Ann. § 36-1-113(g)(4) (2017).

The trial court found that Parents committed severe abuse as defined in Tenn. Code Ann. § 37-1-102 (b)(22)(B) (2017), which it quoted,[11]

> Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from [that contact].

Father argues that this was error because the trial court did not specify the exact definition upon which it relied. That is, the trial court cited Tenn. Code Ann. "§37-1-102" and not Tenn. Code Ann. § 37-1-102 (b)(22)(B). We disagree because the trial court essentially quoted § 37-1-102 (b)(22)(B) verbatim.

---

[11] Although the trial court cited Tenn. Code Ann. § 37-1-102 and not specifically, § 37-1-102 (b)(22)(B), the trial court essentially quoted this section verbatim.

16

Father also argues that the trial court did not provide specific findings of fact regarding the severe child abuse. Again, we disagree because the trial court's order provided extensive findings of fact exclusive of the previous dependency and neglect proceeding.

Mother argues that DCS did not prove by clear and convincing evidence that Mother caused the child's developmental delays "because there is evidence that the child needs to be retested for autism." Mother also argues the trial court erred because DCS's expert testimony was stale. We respectfully disagree with both contentions because, *inter alia*, there is no competent evidence to support Mother's contention that the findings and diagnosis by the Chattanooga Autism Center or by Dr. Freeman are unreliable evidence of the abuse Charles suffered while in the care and custody of Parents in 2013. Moreover, as the Center concluded, "his history of neglect and rapid improvement in skills with intervention suggest these delays are due to his early environment and relationship with caregivers." Indeed, the findings of the Center and Dr. Freeman are compelling evidence of severe child abuse while in the care and custody of Parents due to, *inter alia*, Charles essentially being nonverbal, having to grunt or point to communicate, and the unrefuted testimony that his language delays severely impaired his ability to function in his environment and adversely affected his ability to learn contrasted with the fact there is clear and convincing evidence that Charles improved immensely after his removal.

Moreover, Ms. Choate, the child's preschool teacher for the 2014 – 2015 school year, revealed that although the child scored below average in all subjects except reading at the beginning of the school year, Charles "went from being at the bottom at the beginning of fall to being toward the top in winter." Ms. Wright also testified to the child's improvement, stating that in her six years of working exclusively in foster care for DCS and working with over one hundred children, Ms. Wright saw "the most improvement in Charlie than any other child."

Furthermore, the trial court relied, *inter alia*, on the following findings to conclude that Parents severely abused the child:

> Ms. Crabtree, an early intervention specialist with the State of Tennessee, and Ms. Ramsey, who was a speech pathologist for Fentress County school system, both testified about the impact that the neglect had on this child.[12]
>
> They also testified about the leaps and bounds that this child had made with regards to his improvement after he was removed form that home, and it

---

[12] The trial court's order references the fact that this testimony was offered in both the dependency and neglect proceeding and the trial in this case.

was their testimony that there was no other basis for this child's developmental delay or his inability to adequately function in his environment other than the simple fact that parents had perpetrated severe child abuse towards his child.

. . .

[T]here is the additional testimony of Dr. Bradley Freeman and his testimony has been presented through a deposition.

Dr. Freeman's testimony was that the neglect suffered by this child at the hands of his parents caused severe developmental delay as well as severe impairment in the child's ability to function adequately in his environment.

It's clear from the proof in this trial that the parents did nothing to protect this child from this neglect and are, in fact, the perpetrators of this neglect which was severe abuse.

The child was, in effect, locked in a cage, a room from which he could not escape, which has the only window in the room covered, a room filled with dog feces and urine, a room where he was found by Nathaniel Linder, naked and making grunting sounds, as he hung from the top of the second gate, shaking it and trying to get free.

This child, though of at least average intelligence with no known basis for his developmental delay, was three years old and only able to speak five to ten words.

He was severely traumatized by being locked away by his parents which was evidenced by his reaction anytime a door was closed or he was placed in an enclosed space.

There was specific testimony from [Foster Mother] that the child growled and barked rather than speaking. That he would bite others when upset. That when offered food on a plate he would try to place it in the floor and eat on all fours. She also testified regarding an incident on a trampoline where the child just completely fell to pieces when they zipped up the screen around the trampoline to keep him from falling out.

The child basically stood there and jumped with one arm stuck through the hole and was perfectly fine after that.

18

There was an incident in the early intervention program when he tore a baby gate completely off of the wall according to testimony of Ms. Crabtree.

The evidence presented during the 2017 trial established that when the child was removed in 2013 he showed little emotion and was not receptive to affection, could not follow directions, and was not potty trained. The child also had extreme difficulty interacting with other children and adults, which was exemplified through testimony that when difficultly arose in play with other children, the child would crouch down on all fours, bare his teeth, and growl. Furthermore, soon after he was removed from Parents, when dining at the foster home he would remove his plate from the table and eat on the ground. However, after the child was removed from Parents' home, the child's condition drastically improved. Numerous witnesses testified not only to the child's improvement but also what the witnesses believed was the cause of the child's issues: Parents' neglect. Ms. Crabtree, who was certified as an expert in child development and early invention at trial, testified that she did not observe any identifiable reason within the child himself for his lack of language but rather that the child was neglected and that it appeared that "no one had talked to him." DCS also put on evidence that the child was tested at the Chattanooga Autism Center (the "Center"), and the Center ruled out autism, noting that, "his history of neglect and rapid improvement in skills with intervention suggest these delays are due to his early environment and relationship with caregivers."

Ms. Ramsey, who was certified at trial as an expert in speech and language pathology and assessed the child in May of 2013, observed no physical malformations or intellectual disabilities that would have affect the child's speech. She, instead, testified that neglect could have caused the child's severe language delays. [13]

Dr. Freeman's conclusion also supported a finding of severe abuse. Dr. Freeman conducted a forensic mental health evaluation of the child on June 11 and August 20, 2014, and concluded that the child's developmental delay is "more likely than not . . . due to early environmental neglect rather than an organic etiology (e.g. autism, dyslexia, learning disorder.)"

Therefore, after a review of the trial court's findings and the record as a whole, the record clearly and convincingly supports the trial court's finding that Parents committed severe child abuse as defined in Tenn. Code Ann. § 37-1-102(b)(22)(B).

---

[13] When asked "what causes a child of Charlie's age to be so severely delayed?" she responded,

> With there being no other reasoning, a lot of times the children aren't spoken to or have that conversation or face-to-face time when they're learning in the critical stages. From birth to the age he was then, it's critical they have face-to-face time, even if it's just facial movements.

## IV. BEST INTERESTS

If the trial court finds that a ground for termination has been proven by clear and convincing evidence, the court must then consider whether termination of the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(1)–(2); *White v. Moody*, 171 S.W.3d 187, 192-93 (Tenn. Ct. App. 2004). In making that determination, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citations omitted).

Tenn. Code Ann. § 36-1-113(i) identifies nine statutory factors for the court to consider, if relevant, in conducting a best-interests analysis. [14] "Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis." *In re Navada N.*, 498 S.W.3d 579, 607 (Tenn. Ct. App. 2016) (citations omitted). However, as the Tennessee Supreme Court recently held,

---

[14] The statutory factors are:

(1)   Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)   Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)   Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)   Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)   Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)   Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)   Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)   Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). The trial court is also not required to total up each of the factors and determine whether the sum of them weighs in favor or against the parent. *In re Audrey S.,* 182 S.W.3d at 878. "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

Here, the trial court found that termination of Parents' rights was in the child's best interest. The trial court found that Parents did not adjust their circumstances, conduct, or conditions as to make it safe for the child to return home. *See* Tenn. Code Ann. § 36-1-113(i)(1). This is clearly supported by the evidence that Parents' home still contained animal urine and feces four years after the child was removed from the home.

Next, the trial court found that Parents have not made any type of lasting adjustment after reasonable efforts by available social services. *See* Tenn. Code Ann. § 36-1-113(i)(2). This finding is supported by DCS's numerous attempts to provide Parents with support and Parents' denial of DCS's support or Parents' non-compliance. For example, Parents did not improve their parenting skills through compliance with their physical evaluation/parenting assessment and did not keep their home clean.

The trial court also found that Parents "did visit, but that's all they did. They have done almost nothing else." *See* Tenn. Code Ann. § 36-1-113(i)(3). The record clearly supports this finding.

The trial court found that when the child "was removed from his parents' home, he didn't show any attachment to them. He did not even cry for his parents and has, based on all the testimony, done so very little if any throughout the time since removal." *See* Tenn. Code Ann. § 36-1-113(i)(4). The record supports this finding.

With regard to a change in the child's environment, the trial court found returning the child to Parents' home would have a significantly negative impact. *See* Tenn. Code Ann. § 36-1-113(i)(5). This finding is clearly supported by the fact that Parents did little to change their parenting skills or make their home safe and clean for the child in stark contrast to the child's dramatic improvement in the foster home.

The trial court found that Tenn. Code Ann. §36-1-113(i)(6) weighed in favor of termination as the court had just found Parents severely abused the child. As stated above, we affirm the finding of severe abuse.

The trial court found that both Tenn. Code Ann. § 36-1-113(i)(7) and (8) weighed in favor of termination. The trial court found that "parents have displayed, through the over four years since removal of this child, a serious lack of mental and emotional stability. It has prevented them from making any change to the circumstances which led to this child's removal, let alone any ability to provide a safe and stable home and supervise the child." The record fully supports this finding.

The trial court also found that Parents "have made little or no effort to support this child." Tenn. Code Ann. § 36-1-113(i)(9). The record fully supports this finding as there is no evidence that Parents paid child support.

The trial court also considered the following:

[Parents] have shown little or no concern for the welfare of the child. They have not really even asked how he was doing. They haven't asked about appointments he had, educationally or otherwise. Their major concern has been from day one, and continues to be today, about themselves and any rights that might be violated by making them be involved in this process.

They continue to make choices that prevent this child's safe return.

They've made little or no effort to change.

They had [Mother's] father, who is a sex offender that perpetrated on Mother, living in their home and lied about that circumstance. She has and continues to have phone visits with inmates in the Fentress County jail who are sex offenders for the purpose of giving them "legal advice." [Father] who is a sex offender himself has a current pending indictment for violation of the sex offender registry.

They had another couple that they met a flea market living in their home, and according to their testimony they really didn't know anything about this couple except that they didn't like them much.

This child is in a home where every need that he has had has been met, through not only service providers and medical providers and other professionals, but in so many ways, by two loving and stable parents for this child.

It is an adoptive home, where he has been for over four years.

He has an amazing bond with this family, and with a child that has become his sibling.

For the foregoing reasons, we affirm the trial court's finding that termination of Parents' rights is in the child's best interest.

**IN CONCLUSION**

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Father and Mother.

_____

FRANK G. CLEMENT JR., P.J., M.S.